1  ZANDRA L. LOPEZ
   California State Bar No. 216567
2  LAW OFFICE OF ZANDRA L. LOPEZ
   427 C Street, Suite 300
3  San Diego, California 92101
   Telephone No. (619) 233-3169, x 17
4  E-mail: zll@zandralopezlaw.com

5

6  Attorney for Mr. Amezquita-Luna

7

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10              (HON. WILLIAM Q. HAYES)

11

12 UNITED STATES OF AMERICA,    )    Criminal No. 07CR3032-WQH
                                )
13        Plaintiff,            )    MEMORANDUM OF POINTS AND
                                )    AUTHORITIES IN SUPPORT
14 v.                           )    DEFENDANT'S MOTIONS
                                )
15 ISRAEL AMEZQUITA-LUNA,       )
                                )
16        Defendant.            )
   _____   _____)

17

18

19                          I.

20                    **BACKGROUND**

21        On October 11, 2007, Agent Booth was patrolling near the area of the Tecate Port of Entry and

22 received information that there were illegal immigrants traveling north from the border.[1]  At about 6:00

23 p.m. he went to the area of Highway 94 and Barrett Smith Road.  He exited his car and hid behind a

24 bush.  After a while, the sun had set but Agent Booth could see silhouettes walking by 15 yards away.

25 Agent Booth claims that after flashing his flashlights at the two men, they went separate ways.  One of

26 the two men was Mr. Amezquita-Luna.

27

28 _____

        These statements are taken directly from government produced discovery, the defendant does not
   accept them as true but cites them only as a reference for the Court.

Mr. Amezquita-Luna ran down a steep and rugged embankment and Agent Booth could see Mr. Amezquita-Luna stumbling and falling in the dark embankment. Agent Booth claims that Mr. Amezquita-Luna then attempted to through sand in Agent Booth's face and he later made a gesture as if he was going to punch him. At one point during the chase, Mr. Amezquita-Luna was struck with Agent Booth's flashlight both in the back of his head and on his forehead, causing severe bleeding. Agent Booth continued to follow Mr. Amezquita-Luna and at one point, Agent Booth believed that Mr. Amezquita-Luna had a rock in his hand and was about to throw it at Agent Booth. Agent Booth then reached for his gun and shot Mr. Amezquita in the abdomen.

Mr. Amezquita-Luna suffered severe injuries and was transported to the hospital, where he was interviewed by agents the next morning.

On November 7, 2007, a grand jury indicted Mr. Amezquita-Luna with 18 U.S.C. 111(a)(1) (assault on a federal officer) and 8 U.S.C. 1326(a) and (b) (deported alien found in the United States). According to the indictment, the January 2007 Grand Jury handed down the indictment. See Ex. A (indictment).

These motions follow.[2]

## II.

## MOTION TO DISMISS THE INDICTMENT DUE TO A GRAND JURY VIOLATION

### A.    Introduction.

The indictment in this case was returned by the January 2007 grand jury. See Ex. A (indictment). United States District Court Judge Larry A. Burns voir dired and instructed the grand jury on January 11, 2007. See See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, attached as Exhibit B (instruction), and Reporter's Transcript of Proceedings, dated January 11, 2007, attached as Exhibit C (voir dire). Judge Burns's instructions to the impaneled grand jury amount to structural error. First, Judge Burns' instructions erroneously constrains the power of the grand jury in violation of United States v.

A declaration in support of these motions will be subsequently filed with this Court.

_Williams_, 504 U.S. 36, 49 (1992) and _Vasquez v. Hillary_, 474 U.S. 254 (1986).  Second, Judge Burns's instructions conflict with _Williams_' holding that there is no duty to present exculpatory evidence to the grand jury, leaving the grand jury with the erroneous impression that all evidence undercutting probable cause will be presented to them, making it unnecessary for the grand jury to conduct any independent investigation of their own.

**B.     _Navarro-Vargas_ Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California.  _See_ _Navarro-Vargas II_, 408 F.3d 1184.  While the Ninth Circuit has thus far narrowly rejected such challenges, it has, in the course of adopting a highly formalistic approach[3] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases.  The district court's instructions in this case cannot be reconciled with the role of the grand jury as set forth in _Navarro-Vargas II_.  Taken together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those at issue in _Navarro-Vargas_, taking a giant leap in the direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to exercise any quasi-prosecutorial discretion.  That is not the institution the Framers envisioned.  _See_ _Williams_, 504 U.S. at 49.

Significantly, with respect to the grand jury's relationship with the prosecution, the _Navarro-Vargas II_ majority acknowledges that the two institutions perform similar functions:  "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'"  _Navarro-Vargas II_, 408 F.3d at 1200 (quoting _Butz v. Economou_, 438 U.S. 478, 510 (1978)).  _Accord_ _United States v. Navarro-Vargas_, 367 F.3d 896, 900 (9th Cir. 2004) (_Navarro-Vargas_

---

[1]  _See_ _Navarro-Vargas II_, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

I) (Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial."). See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting). It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor." Id. See Niki Kuckes, The Democratic Prosecutor: Explaining the Constitutional Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure § 15.2(g) (2d ed. 1999)).

Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth in Vasquez, 474 U.S. 254. See id.

> The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense—all on the basis of the same facts. And, significantly, the grand jury may refuse to return an indictment even "'where a conviction can be obtained.'"

Id. (quoting Vasquez, 474 U.S. at 263).

The Supreme Court has itself reaffirmed Vasquez's description of the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls not only the initial decision to indict, but also significant questions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime." Id. at 399 (citing Vasquez, 474 U.S. at 263). Judge Hawkins notes that the Navarro-Vargas II majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor has established probable cause that this individual has committed a crime." See id. at 1214 (Hawkins, J. dissenting). Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J., dissenting). In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit. But not in Judge

Burns's instructions.

The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision in Marcucci. Marcucci reasoned that the instructions do not mandate that grand jurors indict upon every finding of probable cause because the term "should" may mean "what is probable or expected." 299 F.3d at 1164 (citation omitted). That reading of the term "should" makes no sense in context, as Judge Hawkins ably pointed out. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence."). See also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American Diction and Language Guide 1579 (1999) (brackets in original)).

The debate about what the word "should" means is irrelevant here; the instructions here make no such fine distinction. Judge Burns's grand jury instructions make it painfully clear that grand jurors simply may not choose not to indict in the event of what appears to them to be an unfair application of the law: should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient'...." See Ex. B at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror would read this language as instructing, or even allowing, him or her to assess "the need to indict." Vasquez, 474 U.S. at 264.

While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether an indictment was required if probable cause existed, see Ex. B at 4, 8, in context, it is clear that he could only mean "should" in the obligatory sense. For example, when addressing a prospective juror, Judge Burns not only told the jurors that they "should" indict if there is probable cause, he told them that if there is not probable cause, "then the grand jury should hesitate and not indict." See id. at 8. At least in context, it would strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving

room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205. Clearly he was not.

The full passage cited above effectively eliminates any possibility that Judge Burns intended the Navarro-Vargas spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. C at 8. Of the two sentences containing the word "should," the latter of the two essentially states that if there is no probable cause, you *should* not indict. Judge Burns could not possibly have intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159). That would contravene the grand jury's historic role of protecting the innocent. See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's "responsibilities continue to include both the determination whether there is probable cause and the protection of citizens against unfounded criminal prosecutions.") (citation omitted).

By the same token, if Judge Burns said that "the case should move forward" if there is probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended two different meanings of the word "should" in the space of two consecutive sentences. That could not have been his intent. But even if it were, no grand jury could ever have had that understanding.[4] Jurors are not presumed to be capable of sorting through internally contradictory instructions. See generally United States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

---

[2] This argument does not turn on Mr. Amezquita-Luna's view that the Navarro-Vargas/Marcucci reading of the word "should" in the model instructions is wildly implausible. Rather, it turns on the context in which the word is employed by Judge Burns in his unique instructions, context which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly clear to the grand jurors that "should" was not merely suggestive, but obligatory, on multiple occasions:

The first occasion occurred in the following exchange when Judge Burns conducted voir dire and excused a potential juror (CSW):

The Court: . . . If there's probable cause, then the case should go forward. I wouldn't want you to say, "Well, yeah, there's probable cause. But I still don't like what the government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that's your frame of mind, then probably you shouldn't serve. Only you can tell me that.
Prospective Juror: Well, I think I may fall in that category.
The Court: In the latter category?
Prospective Juror: Yes.
The Court: Where it would be difficult for you to support a charge even if you thought the evidence warranted it?
Prospective Juror: Yes.
The Court: I'm going to excuse you then.

See Ex. C at 17. There was nothing ambiguous about the word "should" in this exchange with a prospective juror. Even if the prospective juror did not like what the government was doing in a particular case, that case "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that. See id. ("I wouldn't want you [to vote against such a case]"). The sanction for the possibility of independent judgment was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to the exercise of discretion by any other prospective grand juror.

On another occasion, in an even more explicit example of what "should" meant, Judge Burns makes clear that it there is an unbending obligation to indict if there is probable cause. Grand jurors have no other prerogative.

Court  . . . It's not for me to say, "Well, I don't like it. So I'm not going to follow it here."

You'd have a similar *obligation* as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of Congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.

That's not what your *prerogative* is here. Your prerogative instead is act like a judge and to say, "All right. This is what I've got to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And*

*then your obligation, if you find those things to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?" Id. at 27.  The potential juror responded: "It would depend on the case." Id.  Nevertheless, that juror was excused. Id. at 28.  Again, in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if there is probable cause.

Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case."  Thus, it is clear that Judge Burns's point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service.  It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual scenarios, perhaps many.  But Judge Burns did not pursue the question of what factual scenarios troubled the prospective jurors, because his message is that there is no discretion not to indict.

As if the preceding examples were not enough, Judge Burns continued to pound home the point that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws here." See id. at 61.

And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. B at 9.

Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the

penalties to which indicted persons may be subject.

> Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is about because there is a disparity between state and federal law.
> The Court:  In what regard?
> Prospective Juror: Specifically, medical marijuana.
> The Court:  Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things.  We'd ask you to also abide by that.*  We want you to make a business-like decision of whether there was a probable cause. ...

See Ex. C at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause" would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two reasons.  First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that context, as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly authorized consideration of penalty information.  See 474 U.S. at 263.

Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there was probable cause.  These instructions go far beyond the holding of Navarro-Vargas and stand in direct contradiction of the Supreme Court's decision in Vasquez.  Indeed, it defies credulity to suggest that a grand juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in Vasquez:

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not.  In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the basis of the same facts.  Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."

474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J., dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime."). Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." See id. at 264. Judge Burns's grand jury is not Vasquez's grand jury. The instructions therefore represent structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand jury proceeding." See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992). Thus, the indictment must be dismissed. Id.

The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the instructions' excesses. The Navarro-Vargas II majority attributes "[t]he grand jury's discretion—its independence—[to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it independent." Id. at 1202 (emphases in the original).

Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the 'structure' and 'function' of the grand jury—particularly the secrecy of the proceedings and unreviewability of many of its decisions—sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting). The flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond making a probable cause determination ... unconstitutionally undermines the very structural protections that the majority believes save[] the instruction." Id. After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). If the "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described in Vasquez. Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous instructions because nothing will happen if they disobey them." Id.

In setting forth Judge Hawkins' views, Mr. Amezquita-Luna understands that this Court may not adopt them solely because the reasoning that supports them is so much more persuasive than the majority's sophistry. Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

Here, again, the question is not an obscure interpretation of the word "should", especially in light of the instructions and commentary by Judge Burns during voir dire discussed above—unaccounted for by the Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both Navarro-Vargas II opinions. Navarro-Vargas II is distinguishable on that basis, but not only that.

Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly states they enjoy. He also excused prospective grand jurors who might have exercised that Fifth Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." See Ex. B at 8; Ex. C at 17, 28. The structure of the grand jury and the secrecy of its deliberations cannot embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience of the community. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under Vasquez "serves ... to protect the accused from the other branches of government by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)). The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both fashioned his own rules and enforced them.

**C.    The Instructions Conflict with Williams' Holding That There Is No Duty to Present Exculpatory Evidence to the Grand Jury.**

In Williams, the defendant, although conceding that it was not required by the Fifth Amendment, argued that the federal courts should exercise their supervisory power to order prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment common law. See 504 U.S. at 45, 51. Williams held that "as a general matter at least, no such 'supervisory'

judicial authority exists." <u>See</u> <u>id.</u> at 47. Indeed, although the supervisory power may provide the authority

"to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

Court and by Congress to ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted),

it does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance."

<u>Id.</u> at 47 (emphasis added). The federal courts possess only "very limited" power "to fashion, on their own

initiative, rules of grand jury procedure." <u>Id.</u> at 50. As a consequence, <u>Williams</u> rejected the defendant's

claim, both as an exercise of supervisory power and as Fifth Amendment common law. <u>See</u> <u>id.</u> at 51-55.

Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would

present to them evidence that tended to undercut probable cause. <u>See</u> Ex. B at 20.

> Now, again, this emphasizes the difference between the function of the grand jury and the
> trial jury. You're all about probable cause. If you think that there's evidence out there that
> might cause you say "well, I don't think probable cause exists," then it's incumbent upon
> you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are*
> *duty-bound to present evidence that cuts against what they may be asking you to do if they're*
> *aware of that evidence*.

<u>Id.</u> (emphasis added). Moreover, Judge Burns later returned to the notion of the prosecutors and their duties,

advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them]

will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." <u>See</u> <u>id.</u> at

27. The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." <u>See</u> <u>Navarro-</u>

<u>Vargas</u>, 408 F.3d at 1207.

This particular instruction has a devastating effect on the grand jury's protective powers, particularly

if it is not true. It begins by emphasizing the message that <u>Navarro-Vargas II</u> somehow concluded was not

conveyed by the previous instruction: "You're all about probable cause." <u>See</u> Ex. B at 20. Thus, once

again, the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely

would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they

should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will present it. The end result, then, is that grand jurors should consider evidence that goes against probable cause, but, if none is presented by the government, they can presume that there is none. After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." See id. Moreover, during voir dire, Judge Burns informed the jurors that "my experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. *They have a duty to do that*." See Ex. C at 14-15 (emphasis added). Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See Ex. B at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

(1)    I have to consider evidence that undercuts probable cause.

(2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.

(3)    Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions, therefore, discourage investigation—if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time—and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented. A grand jury so badly misguided is no grand jury at all under

the Fifth Amendment.

This is particularly troubling in this case, because government-produced discovery makes clear that the prosecutors in this case had ample exculpatory evidence at their disposal by the time the grand jury met to pass on Mr. Amezquita-Luna's indictment. Mr. Amezquita-Luna denied that any intention to assault the border patrol agent. Moreover, there the government-produced discovery indicates that the agent was the one that used excessive force. Given Judge Burns's instructions, if the prosecutors in Mr. Amezquita-Luna's case did not in fact present exculpatory evidence, the grand jury would have been misled into believing that there was no exculpatory evidence, because the prosecutor would not—as Judge Burns put it—"play hide the ball." See Ex. C at 14-15. Thus, in this case, unless the prosecutor presented the exculpatory evidence available to him, the grand jury was fatally misled.

Unless the prosecutor concedes that the grand jury was not, in fact, presented with exculpatory evidence in the prosecutor's possession (in which case, the indictment should be dismissed), Mr. Amezquita-Luna moves for production of Mr. Amezquita-Luna's grand jury proceeding so that this issue can be resolved on the full evidence.

### III.

### MOTIONS TO DISMISS COUNT ONE

**A.    Introduction**

Count one of the indictment charges:

On or about October 11, 2007, within the Southern District of California, defendant Israel Amezquita-Luna did knowingly, intentionally and forcibly assault, resist, oppose, impede, and interfere with a person named in Title 18, United States Code, Section 1114, to wit, Department of Homeland Security, United States Border Patrol Agent R. Booth, in that defendant, in an effort to resist arrest, attempted to punch Agent Booth, fled from Agent Booth, and attempted to strike Agent Booth with a large rock, while agent Booth was engaged in the performance of his official duties; in violation of Title 18, United States Code, Sections 111(a)(1), a felony.

This count is defective, and should be dismissed, for the following reasons: (1) it is duplicitous because it charges in one count the separate offenses of assaulting, resisting, opposing, impeding, and interfering; and (2) it fails to charge the element of willfulness.

14

**B.     Duplicity Motions**

### 1.     The Law

Federal Rule of Criminal Procedure 8(a) prohibits charging two or more offenses in the same count of an indictment.  "Duplicity is the joining of two or more distinct offenses in a single count, so that the general verdict does not reveal exactly which crimes the jury found the defendant committed."  United States v. Gomberg, 715 F.2d 843, 845 (3d Cir. 1983), overruled on other grounds, Garrett v. United States, 471 U.S. 773 (1985).  Combining offenses in one count creates several problems:

> (1) The jury in a general verdict cannot make a finding on each offense; (2) A defendant may not have proper notice of the charges against him; (3) It may be difficult if not impossible to make correct evidentiary rulings; (4) A jury may convict a defendant without unanimously agreeing on the same offense; (5) A defendant may be prejudiced in a subsequent double jeopardy defense; (6) A defendant may be prejudiced at sentencing; and (7) A defendant may face limited review on appeal.

United States v. Gray, 101 F. Supp. 2d 580, 583 (E.D. Tenn. 2000); see also United States v. Aguilar, 756 F.2d 1418, 1420 n.2 (9th Cir. 1985); United States v. UCO Oil Co., 546 F.2d 833, 835 (9th Cir. 1976).

### 2.     Count One Is Duplicitous Because It Charges The Separate Offenses Of Assaulting, Resisting, Opposing, Impeding, And Interfering

"The various words used to describe the type of behavior prohibited by Section 111 constitute separate and distinct offenses . . . ."  United States v. Johnson, 462 F.2d 423, 428-29 (3d Cir. 1972).  The Fifth Circuit reached the same conclusion in United States v. Marchello, 423 F.2d 993, 1011 (5th Cir. 1970), holding that assault and intimidation are "two different offenses."

Accordingly, the government has charged at least five offenses in the indictment.  Thus, the Court should dismiss count one.

**C.     The Indictment Fails To Charge Wilfulness**

An assault, as charged in this case, requires a "willful attempt to inflict injury upon the person of another . . . ."  United States v. Sommerstedy, 752 F.2d 1494, 1497 (9th Cir. 1985) (citation and quotation omitted); see also Potter v. United States, 691 F.2d 1275, 1280 (8th Cir. 1982) (same).

In Bryan v. United States, 524 U.S. 184, 191-96 (1998), the Supreme Court provided a detailed

explanation of the meaning of "willfully," noting that "when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose.'" Id. at 191. The Supreme Court explained that "in order to establish a 'willful' violation of a statute, the government must prove that the defendant acted with knowledge that his conduct was unlawful." Bryan, 524 U.S. at 191-92 (emphasis added) (quoting United States v. Ratzlaf, 510 U.S. 135, 137 (1994)). There are several other cases, in a variety of statutory contexts, that recite the same definition of "willful." See, e.g., Ratzlaf, 510 U.S. at 137 (stating same definition of "willful" in statute prohibiting structuring cash transactions to avoid federal reporting requirements); Cheek v. United States, 498 U.S. 192, 201 (1991) (same definition of "willful" for tax evasion statute); United States v. Garcia, 751 F.2d 1033, 1036 (9th Cir. 1985) (same definition for statute prohibiting "willfully" misapplying funds obtained under the Comprehensive Employment and Training Act). Congress is presumed to be familiar with, and legislate according to, the established meaning of "willful." See United States v. Carrier, 672 F.2d 300, 303 (2d Cir. 1982), citing Hamling v. United States, 418 U.S. 87, 118 (1974).

Thus, wilfulness is the highest *mens rea* known, and *mens rea* is always an element of an offense. Accordingly, because that element was not charged here, the indictment was dismissed.

### IV.

### FOURTH AMENDMENT ISSUES

Mr. Amezquita-Luna moves the Court to suppress evidence, and/or dismiss the indictment, based on the following Fourth Amendment violation: unreasonable seizure, based on unreasonable use of force in apprehending him. In their effort to seize Mr. Amezquita-Luna, the agent hit him with a flashlight on the back of his head, then hit him with the flashlight on his forehead, and then shot Mr. Amezquita-Luna in the abdomine, seriously injuring him. "Whenever an officer restrains the freedom of a person to walk away, he has seized that person." Tennessee v. Garner, 471 U.S. 1, 7 (1985).

The issue, then, is whether the seizure here was "reasonable," the touchstone of Fourth Amendment analysis. Graham v. Connor, 490 U.S. 386, 396-98 (1989), makes clear that use of "excessive force" violates the reasonableness requirement of the Fourth Amendment.

Mr. Amequita-Luna asserts that the agents used excessive force in seizing him, and thus that the Court should suppress the fruits of that seizure, or dismiss the indictment.  Of course, to fully litigate this claim, Mr. Amezquita-Luna will need discovery relating to the events surrounding his shooting (and the opportunity to have his experts assess that discovery), which discovery is addressed in the "Discovery" portion of this brief.

**V.**

**THE COURT SHOULD SUPPRESS ANY ALLEGED STATEMENTS**

The government contends that Mr. Amezuita-Luna waived his <u>Miranda</u> rights and made custodial statements while he was in the hospital, on the morning of October 12, 2007.  At the time, Mr. Amezquita-Luna was getting on-going treatment due to his serious and multiple head injuries and bullet wound to the abdomen, and was under the influence of strong painkillers.  In that regard, defense counsel have not yet received and/or reviewed all the relevant medical records, nor had a chance to present such to an expert for his/her opinion.

However, based on what is known now, Mr. Amezquita-Luna moves to suppress his statements for two reasons:  (1) they were not voluntary, pursuant to 18 U.S.C. §3501, <u>see</u> <u>Gladden v. Unsworth</u>, 396 F.2d 373, 380-81 (9th Cir.1968) ("A statement may not be admitted if because of mental illness, drugs, or intoxication, the statement was not the product of a rational intellect and a free will"); and (2) any alleged waiver was not knowing, intelligent, and voluntary.  <u>See</u> <u>United States v. Pierce</u>, 572 F.2d 1339, 1341 (1978) (<u>Miranda</u> waiver may not be knowing, intelligent, and voluntary where defendant is intoxicated).

**VII.**

**THIS COURT SHOULD DISMISS COUNT 2 OF THE INDICTMENT FOR ITS FAILURE TO ALLEGE ESSENTIAL ELEMENTS OF THE OFFENSE**

Count 2 of the indictment charges Mr. Amezquita-Luna with being a previously-deported alien found in the United States in violation of 8 U.S.C. § 1326.  The indictment fails to allege elements necessary to convict Mr. Amezquita-Luna of the offense: that Mr. Amezquita-Luna knew he was in the United States,

he failed to undergo inspection and admission by an immigration officer at the nearest inspection point, and that he voluntarily entered the United States. As a consequence, it must be dismissed. See e.g., Nyrienda v. I.N.S., 279 F.3d 620 (8th Cir. 2002) (setting forth the components of an entry under the immigration law); see also United States v. Pernillo-Fuentes, 252 F.3d 1030 (9th Cir. 2001); United States v. Du Bo, 186 F.3d 1177, 1179 (9th Cir. 1999);.

These issues were decided against Mr. Amezquita-Luna in United States v. Rivera-Sillas, 376 F.3d 887 (9th Cir. 2004). However, these issues remain open in the Supreme Court. To reserve these issues for further review, Mr. Amezquita-Luna incorporates the arguments made by the defendant in Rivera-Sillas. If the Court wants full briefing on these issues, Mr. Amezquita-Luna will provide it.

**VII.**

**DISCOVERY**

Mr. Amezquita-Luna requests the following discovery. His request is not limited to those items of which the prosecutor is aware. It includes all discovery listed below that is in the custody, control, care, or knowledge of any "closely related investigative [or other] agencies." See United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989).

(1)  Brady Information. The defendant requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the government's case. Under Brady v. Maryland, 373 U.S. 83 (1963), impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused. United States v. Bagley, 473 U.S. 667 (1985); United States v. Agurs, 427 U.S. 97 (1976).

(2)  Any Proposed 404(b) Evidence. The government must produce evidence of prior similar acts under Fed. R. Crim. P. 16(a)(1) and Fed. R. Evid. 404(b) and any prior convictions which would be used to impeach as noted in Fed. R. Crim. P. 609. In addition, under Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature" of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial. The defendant

requests notice two weeks before trial to give the defense time to investigate and prepare for trial.

(3)  Request for Preservation of Evidence.  The defendant requests the preservation of all physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government and which relate to the arrest or the events leading to the arrest in this case.  This request includes, but is not limited to, the results of any fingerprint analysis, the defendant's personal effects, and any evidence seized from the defendant or any third party. **This request specifically includes any video taken either in the field or at the station.  This also includes any photographs taken including the color six pack photo lineup.**

(4)  Defendant's Statements.  The defendant requests disclosure and production of all statements made by the defendant.  This request includes, but is not limited to, the substance of any oral statement made by the defendant, Fed. R. Crim. P. 16(a)(1)(A), and any written or recorded statement made by the defendant.  Fed. R. Crim. P. 16(a)(1)(B)(I)-(iii).

(5)  Tangible Objects.  The defendant seeks to inspect and copy as well as test, if necessary, all other documents and tangible objects, including photographs, books, papers, documents, fingerprint analyses, vehicles, or copies of portions thereof, which are material to the defense or intended for use in the government's case-in-chief or were obtained from or belong to the defendant.  Fed. R. Crim. P. 16(a)(1)(E). **This request includes the photographs, videos, dispatch recordings, injury reports, and the jacket referenced in discovery.**

(6)  Expert Witnesses.  The defendant requests the name, qualifications, and a written summary of the testimony of any person that the government intends to call as an expert witness during its case in chief. Fed. R. Crim. P. 16(a)(1)(G).

(7)  Witness Addresses.  The defendant requests access to the government's witnesses.  Counsel requests a witness list and contact phone numbers for each prospective government witness.  Counsel also requests the names and contact numbers for witnesses to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will not be called as government witnesses.

(8)  <u>Jencks Act Material</u>.  The defendant requests production in advance of trial of material discoverable under  the Jencks Act, 18 U.S.C. § 3500.  Advance production will avoid needless delays at pretrial hearings and at trial.  This request includes any "rough" notes taken by the agents in this case.  This request also includes production of transcripts of the testimony of any witness before the grand jury.  <u>See</u> 18 U.S.C. § 3500(e)(1)-(3).

(9)  <u>Informants and Cooperating Witnesses</u>.  The defendant requests disclosure of the name(s), address(es), and location(s) of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged.  <u>Roviaro v. United States</u>, 353 U.S. 52, 61-62 (1957).  The government must disclose any information derived from informants which exculpates or tends to exculpate the defendant.  <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  The government must disclose any information indicating bias on the part of any informant or cooperating witness.  <u>Id.</u>

(10)  **Specific Request**.  Mr. Amezquita-Luna specifically requests the opportunity to view the "A-Files" of the material witness in this case.

(11)  **Specific Request**: Mr. Amezquita-Luna specifically requests the opportunity to view his own "A-File" and any documents relating to his alleged deportation and/or removal from the United States.

(12)  **Specific Request**.  Mr. Amezquita-Luna specifically requests an opportunity to review any medical records and/or reports associated with the alleged assault.

(13)  **Specific Request**: Mr. Amezquita-Luna specifically requests an opportunity to review any dispatch recordings from the agents relating to the alleged assault and/or events of October 11, 2007.

(14)  <u>Residual Request</u>.  The defendant intends by this discovery motion to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States.

**VIII.**

**LEAVE TO FILE FURTHER MOTIONS**

Defendant hereby requests leave to file further motions as may be necessary upon receipt of further discovery.


Respectfully submitted,


_s/ Zandra L. Lopez_
Dated: December 3, 2007                    ZANDRA L. LOPEZ
                                           Attorney for Mr. Amezquita-Luna

21