KAREN P. HEWITT
United States Attorney
LAWRENCE A. CASPER
Assistant U.S. Attorney
California State Bar No. 235110
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone No.: (619) 557-7455
Facsimile No.: (619) 235-2757
Lawrence.Casper@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>ISRAEL AMEZQUITA-LUNA,<br><br>　　　　Defendant. | Criminal Case No. 07CR3032-WQH<br><br>District Judge:　　Hon. William Q. Hayes<br>Courtroom:　　　4 (Fourth Floor)<br>Date:　　　　December 17, 2007<br>Time:　　　　2:00 p.m.<br><br>UNITED STATES' RESPONSE AND OPPOSITION TO DEFENDANT'S MOTIONS TO:<br><br>(1) DISMISS INDICTMENT DUE TO IMPROPER GRAND JURY INSTRUCTION;<br>(2) DISMISS COUNT 1;<br>(3) SUPPRESS EVIDENCE;<br>(4) SUPPRESS STATEMENTS;<br>(5) DISMISS COUNT 2;<br>(6) COMPEL DISCOVERY; AND<br>(7) LEAVE TO FILE FURTHER MOTIONS<br><br>TOGETHER WITH STATEMENT OF FACTS, MEMORANDUM OF POINTS AND AUTHORITIES, AND GOVERNMENT'S MOTION FOR RECIPROCAL DISCOVERY AND FINGERPRINT EXEMPLARS. |

Plaintiff, the UNITED STATES OF AMERICA, by and through its counsel KAREN P. HEWITT, United States Attorney, and LAWRENCE A. CASPER, Assistant U.S. Attorney, hereby files its Response and Opposition (R&O) to the above-described motions of Defendant Israel Amezquita-Luna ("Defendant") and files its Motions for Reciprocal Discovery and Fingerprint Exemplars. This R&O and motions are based upon the files and records of this case.

I

**STATEMENT OF FACTS**

### A.    Statement of the Case

On November 7, 2007, a federal grand jury handed up a two-count Indictment charging Defendant Israel Amezquita-Luna with: (1) one count of assault on a federal officer in violation of Title 18, United States Code, Section 111(a)(1); and (2) one count of deported alien found in the United States in violation of Title 8, United States Code, Section 1326.

### B.    Statement of Facts

#### 1.    Defendant's Arrest

On October 11, 2006, U.S. Border Patrol Agent Ricardo Booth was patrolling the area surrounding the Tecate Port of Entry and handling sensor activations. While on patrol, Agent Booth received information that a group of suspected illegal immigrants had traveled north of the International Boundary in his area. After responding to the area and apprehending the group of illegal immigrants, he and his partner, Agent Ross, received a radio call of a sensor activation.

Based on the location of the sensor, Agent Booth knew that illegal immigrants usually travel in one of two directions from the area. At approximately 6:15 p.m., Agent Booth responded to the area of Highway 94 and Barrett Smith Road. Agent Ross responded to another location close by. They intended to make radio contact once it was determined who was in closest proximity to the group. Agent Booth exited his patrol vehicle and hid behind a bush south of Highway 94 near an area known to Agents as the "54" which is a draw or cut in the mountain which is approximately 300 yards east of upper Barrett Smith Road in Dulzura.

Agent Booth attempted to advise Agent Ross that the group of illegal aliens was headed in his direction; that effort was not successful due to difficulty with radio transmission issues in the area. Agent Booth remained in position as the group approached his position. Agent Booth heard the group stop walking when they were approximately twenty yards south of his location on a ridgeline above his position; he overheard one of them say, "If you see La Migra (Border Patrol) don't stop. Keep running." Then he heard one person say "you go this way and we'll go that way."

After a few minutes, Agent Booth heard the group coming down the hill; one group was on each side of him. He decided to apprehend the group closest to him. Although the light was dim as the sun had set, Agent Booth could see two subjects coming down the hill just west of his position. He shined his flashlight on the subjects and identified himself as a Border Patrol Agent in both English and Spanish. One subject turned around and ran back south toward the border. The other subject, later identified as Defendant Israel Amezquita-Luna (Defendant), ran north across Highway 94. Agent Booth used his flashlight to stop traffic and then pursued on foot.

Defendant ran down a steep and rugged embankment located north of Highway 94. He yelled at the Defendant to stop both in English and Spanish but Defendant refused to comply. Defendant fell down on the steep terrain; as Agent Booth approached him, Defendant threw a handful of dirt at the agent's face which did not reach the agent. Defendant got up and continued running and refused to comply with Agent Booth's instruction to stop. Agent Booth repeatedly attempted to make radio contact with his partner or other agents but was unable to do so due to signal difficulties in the area.

Agent Booth continued to follow Defendant down the embankment; the Defendant made a sudden stop and turned back toward him. Agent Booth, who was using his flashlight to guide himself down the path, could see that Defendant's left arm was cocked back. Due to the steep hill he was on, Agent Booth could not stop his downward momentum; to protect himself from the anticipated punch, he used his flashlight intending to strike the Defendant in the chest or shoulder area. Upon making contact and due to the difficult terrain, Defendant fell down; Agent Booth also went down and attempted to place the Defendant under arrest, advising him in both Spanish and English that he was under arrest for illegally entering the United States. Agent Booth attempted to handcuff Defendant and repeatedly told him to give up and surrender but Defendant continued to resist. Defendant was able to break free and got into an aggressive position. Afraid that Defendant would rush him, Agent Booth stepped back and Defendant continued his flight.

By the time they reached the bottom of the embankment, it was very dark outside. Agent Booth chased Defendant through the creek bed while continuing to order him to stop. Defendant

1    ignored his commands and proceeded to fall and get up and run several more times. Defendant

2    continued to throw dirt and sticks at the agent.

3    After one of the Defendant's falls, Agent Booth was close enough to grab Defendant by the

4    shoulders and pull him down. When he attempted to handcuff him, Defendant continued resisting

5    and repeatedly said "nah, nah, nah." Agent Booth continued chasing Defendant and requesting

6    assistance via radio but got no response. After Defendant again fled and fell down and as Agent

7    Booth again approached, Defendant got up and started to walk away. Defendant then stopped and

8    turned back toward the agent. Defendant was approximately five feet away and was holding a

9    baseball sized rock in his left hand, which was cocked back and aimed directly at the agent's face.

10    Due to their close proximity, Agent Booth feared he would be hit and his life would be in jeopardy

11    given the Defendant's aggressive moves. Accordingly, Agent Booth instinctively ducked to avoid

12    being hit by the rock and drew his service weapon and fired one round. At the time, he assumed his

13    shot had missed the Defendant. Defendant threw the rock at him but missed because Agent Booth

14    had ducked. Defendant turned and walked away and then started to run again. Agent Booth

15    holstered his weapon and gave chase ordering Defendant to stop. Defendant ran a distance and then

16    abruptly stopped and turned to face Agent Booth. Defendant raised his arms again in a threatening

17    manner and walked toward the agent saying in English, "Go ahead and kill me. Why don't you go

18    ahead and kill me?" As Defendant got closer, Agent Booth stepped back and placed his hand on the

19    grip of his service weapon telling the Defendant to calm down. Defendant said "nah, nah, nah" and

20    then asked, "Why'd you shoot me for?" At that point, Agent Booth realized that he had struck

21    Defendant when he fired the one round. Defendant walked toward the Agent saying "go ahead and

22    kill me now, why don't you kill me now."

23    Agent Booth ordered Defendant to sit down and cooperate. He placed a handcuff on

24    Defendant's right hand. Defendant kept asking him, "What is your name?" When Agent Booth

25    rolled Defendant on his side to pull his hand behind his back, Defendant was holding another large

26    rock in his left hand. Defendant attempted to extend his left arm but Agent Booth was able to kick

27    the rock out of Defendant's hand. Nonetheless, Defendant continued to resist and refused orders

28    to put his left hand behind his back. Agent Booth put his left knee on Defendant's back and used

his body weight to hold Defendant down on the ground but Defendant rolled over onto his back facing the agent. Fearing that Defendant might attempt to grab the agent's weapon, Agent Booth jumped back while continuing to hold the handcuff attached to Defendant's right hand. Defendant again stood up and "squared off" at Agent Booth. At that point, other Border Patrol agents approached and Defendant began to become compliant although he continued to resist being handcuffed until Agent Tom Engelhorn assisted Agent Booth in putting the handcuff on Defendant's left hand. Subsequently, Defendant was placed on a flatboard and extracted from the deep ravine by rope and pulley with the assistance of rescue personnel.

### 2.    Defendant's Post-<u>Miranda</u> Statement

On October 12, 2007, Defendant was interviewed at Sharp Memorial Hospital. Defendant was advised of his <u>Miranda</u> rights; he waived those rights and agreed to speak with agents. He refused, however, to sign the written waiver form. During his interview, Defendant admitted that he is not a citizen or legal resident of the United States and did not have authorization to be in the United States legally when he entered on October 11, 2007. Defendant claimed that he intended to travel to Riverside, California and claimed that he fears for his family's life in Mexico because it is dangerous there.

Defendant admitted that he entered the United States by following a trail near Tecate, California and did so to avoid detection. He stated that he was initially with a group and that he and another individual split off believing that they could travel faster. During his descent, Defendant was surprised by a Border Patrol agent. At first, he did not know it was a Border Patrol agent but then saw his uniform and knew. Defendant admitted he "took off." Defendant claimed he was scared because someone in his group had spoke of having been "jacked" by some guys although they had not been described as law enforcement officers.

Defendant admitted he heard the Border Patrol Agent yelling at him and instructing him to stop in Spanish. Defendant claimed that, during the pursuit, the agent struck him in the head with a flashlight and then hit him a second time over his left eye after he asked the agent, "Why did you hit me?" He claimed that blood clouded his sight and that he was having difficulty with his contact

lens after being hit.  He heard the agent tell him to "Get down.  Get down." He also heard the agent tell him "don't move or I'll shoot" and "It's not worth it."

Defendant denied having struggled with the Border Patrol agent and denied throwing anything at him.  He first stated that he was handcuffed and then shot by the Border Patrol agent and then said he could not remember the order in which those events occurred.  Defendant claimed he had been wearing a backpack but lost it at some point.  Defendant claimed that the entire episode took approximately 30 seconds.

### C.    Defendant's Criminal History

Defendant has an extensive criminal history, including multiple prior immigration felonies, drug-related offenses, theft and other convictions, as well as numerous prior arrests.

| 7/19/2002 CAMC, Riverside | HS 11377(A): Poss Cont. Subst. | 60 days jail/36 months probation |
|---|---|---|
| 11/16/2005 CASC, Riverside | PC 236: False Imprisonment of Elder/Dependent Adult | 30 mos jail |
| 10/22/1991 CYA, Norwalk | PC187: Murder/Used Firearm | |

## II

## ARGUMENT

### A.    The Grand Jurors Were Properly Instructed

#### 1.    Introduction

Defendant makes contentions relating to two separate instructions given to the grand jury during its impanelment by District Judge Larry A. Burns on January 10, 2007.  [Memorandum of

1    Points and Authorities, pp. 2-14 (hereinafter "Memorandum")[1] Although recognizing that the Ninth

2    Circuit in United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir. 2005) (en banc) generally found

3    the two grand jury instructions constitutional, Defendant here contends Judge Burns went beyond

4    the text of the approved instructions, and by so doing rendered them improper to the point that the

5    Indictment should be dismissed.  In fact, the arguments advanced by Defendant here were recently

6    rejected in a 12 page written order issued by the Hon. Barry T. Moskowitz in this District and an 11

7    page written order issued by the Hon. John A. Houston.  See Order Denying Defendant's Motion

8    to Dismiss the Indictment in United States v. Manuel Martinez-Covarrubias, No. 07cr0491-BTM,

9    filed October 11, 2007 (Appendix 3, hereto); and Amended Order Denying Defendant's Motion to

10   Dismiss the Indictment in United States v. Diana Jimenez-Bermudez, 07cr1372-JAH (Appendix 4,

11   hereto).  In making his arguments concerning the two separate instructions, Defendant urges this

12   Court to dismiss the Indictment on two separate bases relating to grand jury procedures, both of

13   which were discussed in United States v. Isgro, 974 F.2d 1091 (9th Cir. 1992).  Concerning the first

14   attacked instruction, Defendant urges this Court to dismiss the Indictment by exercising its

15   supervising powers over grand jury procedures. [Memorandum at 7].  This is a practice the Supreme

16   Court discourages as Defendant acknowledges, citing United States v. Williams, 504 U.S. 36, 50

17   (1992) ("Given the grand jury's operational separateness from its constituting court, it should come

18   as no surprise that we have been reluctant to invoke the judicial supervisory power as a basis for

19   prescribing modes of grand jury procedure. ").  [Id.]  Isgro reiterated:

20          [A] district court may draw on its supervisory powers to dismiss an
       indictment.  The supervisory powers doctrine "is premised on the inherent ability
21     of the federal courts to formulate procedural rules not specifically required by the
       Constitution or Congress to supervise the administration of justice."  Before it may
22     invoke this power, a court must first find that the defendant is actually prejudiced by
       the misconduct.  Absent such prejudice-that is, absent "'grave' doubt that the
23     decision to indict was free from the substantial influence of [the misconduct]"-a
       dismissal is not warranted.

24

25

26   _____

27        [1]    A "Partial Transcript" of the grand jury proceedings which records the instructions to the
     impaneled grand jurors after the voir dire had been conducted is supplied with this response.
28   [Appendix I.] A redacted "Supplemental Transcript" which records relevant portions of the voir dire
     proceedings is also provided.  [Appendix 2.]

974 F.2d at 1094 (citation omitted, emphasis added).  Concerning the second attacked instruction, in an attempt to dodge the holding in Williams, Defendant appears to base his contentions on the Constitution as a reason to dismiss the Indictment.  Concerning that kind of a contention Isgro stated:

> [A] court may dismiss an indictment if it perceives constitutional error that interferes with the grand jury's independence and the integrity of the grand jury proceeding. "Constitutional error is found where the 'structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice' to the defendant."  Constitutional error may also be found "if [the] defendant can show a history of prosecutorial misconduct that is so systematic and pervasive that it affects the fundamental fairness of the proceeding or if the independence of the grand jury is substantially infringed."

974 F.2d at 1094 (citation omitted).[2]

> The portions of the two relevant instructions approved in Navarro-Vargas were:

> You cannot judge the wisdom of the criminal laws enacted by Congress, that is, whether or not there should or should not be a federal law designating certain activity as criminal.   That is to be determined by Congress and not by you.

408 F.3d at 1187, 1202.

> The United States Attorney and his Assistant United States Attorneys will provide you with important service in helping you to find your way when confronted with complex legal problems.   It is entirely proper that you should receive this assistance.  If past experience is any indication of what to expect in the future, then you can expect candor, honesty, and good faith in matters presented by the government attorneys.

408 F.3d at 1187, 1206.

Concerning the "wisdom of the criminal laws" instruction, the court stated it was constitutional because, among other things, "[i]f a grand jury can sit in judgment of wisdom of the policy behind a law, then the power to return a no bill in such cases is the clearest form of 'jury nullification.'"[3]  408 F.3d at 1203 (footnote omitted).  "Furthermore, the grand jury has few tools

---

[2]   In Isgro the defendants choose the abrogation of constitutional rights route when asserting that prosecutors have a duty to present exculpatory evidence to grand juries.  They did not prevail. 974 F.2d at 1096 ("we find that there was no abrogation of constitutional rights sufficient to support the dismissal of the indictment."  (relying on Williams)).

[3]   The Court acknowledged that as a matter of fact jury nullification does take place, and there is no way to control it.  "We recognize and do not discount that some grand jurors might in fact vote to return a no bill because they regard the law as unwise at best or even unconstitutional.  For all the reasons we have discussed, there is no post hoc remedy for that; the grand jury's motives are not

for informing itself of the policy or legal justification for the law;  it receives no briefs or arguments from the parties.    The grand jury has little but its own visceral reaction on which to judge the 'wisdom of the law.'"  Id.

Concerning the "United States Attorney and his Assistant United States Attorneys" instruction, the court stated:

> We also reject this final contention and hold that although this passage may include unnecessary language, it does not violate the Constitution.   The "candor, honesty, and good faith" language, when read in the context of the instructions as a whole, does not violate the constitutional relationship between the prosecutor and grand jury. . . .  The instructions balance the praise for the government's attorney by informing the grand jurors that some have criticized the grand jury as a "mere rubber stamp" to the prosecution and reminding them that the grand jury is "independent of the United States Attorney[.]"

408 F.3d at 1207.  Id.  "The phrase is not vouching for the prosecutor, but is closer to advising the grand jury of the presumption of regularity and good faith that the branches of government ordinarily afford each other."  Id.

### 2.    The Expanded "Wisdom of the Criminal Laws" Instruction Was Proper

Concerning whether the new grand jurors should concern themselves with the wisdom of the criminal laws enacted by Congress, Judge Burns' full instruction stated:

> You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.
>
> But it's not for you to judge the wisdom of the criminal laws enacted by congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity is criminal is not up to you.   That's a judgment that congress makes.
>
> And if you disagree with the judgment made by congress, then your option is not to say "Well I'm going to vote against indicting even though I think that the evidence is sufficient" or "I'm going to vote in favor of even though the evidence may be insufficient."  Instead, your obligation is to  contact your congressman or advocate for a change in the laws, but not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting.

Partial Transcript pp. 8-9.[4]

_____

open to examination."  408 F.3d at 1204 (emphasis in original).

[4]        The Supplemental Transcript supplied herewith (Appendix 2) recounts the excusing of the three individuals.  This transcript involves the voir dire portion of the grand jury selection process, and has been redacted,  to include redaction of the individual names, to provide only the

1    Defendant acknowledges that, in line with Navarro-Vargas, "Judge Bums instructed the

2    grand jurors that they were forbidden 'from judg[ing] the wisdom of the criminal laws enacted by

3    Congress; that is, whether or not there should be a federal law or should not be a federal law

4    designating certain activity [as] criminal is not up to you.'" [Memorandum p.5.] Defendant notes,

5    however, that "[t]he instructions go beyond that, however, and tell the grand jurors that, should 'you

6    disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote

7    against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of

8    even though the evidence maybe insufficient.'" [Memorandum p. 5.] Defendant contends that this

9    addition to the approved instruction, "flatly bars the grand jury from declining to indict because the

10   grand jurors disagree with a proposed prosecution." [Memorandum p. 5.] Defendant further

11   contends that the flat prohibition was preemptively reinforced by Judge Burns when he "referred to

12   an instance in the grand juror selection process in which he excused three potential jurors," which

13   resulted in his "not only instruct[ing] the grand jurors on his view of their discretion; [but his]

14   enforc[ing] that view on pain of being excused from service as a grand juror."[5] [Memorandum p.

15   3.]

16   In concocting his theory of why Judge Burns erred, Defendant posits that the expanded

17   instruction renders irrelevant the debate about what the word "should" means. [Memorandum pp.

18   6-7.] Defendant contends, "the instruction flatly bars the grand jury from declining to indict because

19   they disagree with a proposed prosecution." [Memorandum p. 6.] This argument mixes-up two of

20   the holdings in Navarro-Vargas in the hope they will blend into one. They do not.

21   Navarro-Vargas does permit flatly barring the grand jury from disagreeing with the wisdom

22   of the criminal laws. The statement, "[y]ou cannot judge the wisdom of the criminal laws enacted

23   by Congress," (emphasis added) authorized by Navarro-Vargas, 408 F.3d at 1187, 1202, is not an

24   expression of discretion. Jury nullification is forbidden although acknowledged as a sub rosa fact

25

26   relevant three incidents wherein prospective grand jurors were excused. Specifically, the pages of
     the Supplemental Transcript supplied are: page 15, line 10 - page 17, line 18; page 24, line 14 - page
27   28, line 2; page 38, line 9 - page 44, line 17.

28   [5]   See Appendix 2.

in grand jury proceedings. 408 F.3d at 1204. In this respect Judge Burns was absolutely within his rights, and within the law, when he excused the three prospective grand jurors because of their expressed inability to apply the laws passed by Congress. Similarly, it was proper for him to remind the impaneled grand jurors that they could not question the wisdom of the laws. As we will establish, this reminder did not pressure the grand jurors to give up their discretion not to return an indictment. Judge Burns' words cannot be parsed to say that they flatly barred the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution, because they do not say that. That aspect of a grand jury's discretionary power (i.e. disagreement with the prosecution) was dealt with in <u>Navarro-Vargas</u> in its discussion of another instruction wherein the term "should" was germane.[6] 408 F.3d at 1204-06 ("'Should' Indict if Probable Cause Is Found"). This other instruction bestows discretion on the grand jury not to indict.[7] In finding this instruction constitutional, the court stated in words that ring true here, "It is the grand jury's position in the constitutional scheme that gives it its independence, not any instructions that a court might offer." 408 F.3d at 1206. The other instruction was also given by Judge Burns in his own fashion as follows:

---

[6]        That instruction is not at issue here. It read as follows:

> [Y]our task is to determine whether the government's evidence as presented to you is sufficient to cause you to conclude that there is probable cause to believe that the accused is guilty of the offense charged. To put it another way, you should vote to indict where the evidence presented to you is sufficiently strong to warrant a reasonable person's believing that the accused is probably guilty of the offense with which the accused is charged.

408 F.3d at 1187.

[7]        The court upheld the instruction stating:

> This instruction does not violate the grand jury's independence. The language of the model charge does not state that the jury "must" or "shall" indict, but merely that it "should" indict if it finds probable cause. As a matter of pure semantics, it does not "eliminate discretion on the part of the grand jurors," leaving room for the grand jury to dismiss even if it finds probable cause.

408 F.3d at 1205 (confirming holding in <u>United States v. Marcucci</u>, 299 F.3d 1156, 1159 (9th Cir. 2002) (per curiam)). "In this respect, the grand jury has even greater powers of nonprosecution than the executive because there is, literally, no check on a grand jury's decision not to return an indictment. 408 F.3d at 1206.

The function of the grand jury, in federal court at least, is to determine probable cause. That's the simple formulation that I mentioned to a number of you during the jury selection process. Probable cause is just an analysis of whether a crime was committed and there's a reasonable basis to believe that and whether a certain person is associated with the commission of that crime, committed it or helped commit it.

If the answer is yes, then as grand jurors your function is to find that the probable cause is there, that the case has been substantiated, and it should move forward. If conscientiously, after listening to the evidence, you say "No, I can't form a reasonable belief has anything to do with it, then your obligation, of course, would be to decline to indict, to turn the case away and not have it go forward.

Partial Transcript pp. 3-4.

Probable cause means that you have an honestly held conscientious belief and that the belief is reasonable that a federal crime was committed and that the person to be indicted was somehow associated with the commission of that crime. Either they committed it themselves or they helped someone commit it or they were part of a conspiracy, an illegal agreement, to commit that crime.

To put it another way, you should vote to indict when the evidence presented to you is sufficiently strong to warrant a reasonable person to believe that the accused is probably guilty of the offense which is proposed.

Partial Transcript p. 23.

While the new grand jurors were told by Judge Burns that they could not question the wisdom of the criminal laws per Navarro-Vargas, they were also told by Judge Burns they had the discretion not to return an indictment per Navarro-Vargas. Further, if a potential grand juror could not be dissuaded from questioning the wisdom of the criminal laws, that grand juror should be dismissed as a potential jury nullification advocate. See Merced v. McGrath, 426 F.3d 1076, 1079-80 (9th Cir. 2005). Thus, there was no error requiring dismissal of this Indictment or any other indictment by this Court exercising its supervisory powers.

Further, a reading of the dialogues between Judge Burns and the three excused jurors found in the Supplemental Transcript excerpts (Appendix 2) reflects a measured, thoughtful, almost mutual decision, that those three individuals should not serve on the grand jury because of their views. Judge Burns' reference back to those three colloquies cannot be construed as pressuring the impaneled grand jurors, but merely bespeaks a reminder to the grand jury of their duties.

Finally, even if there was an error, Defendant has not demonstrated he was actually prejudiced thereby, a burden he has to bear. "Absent such prejudice--that is, absent 'grave' doubt

that the decision to indict was free from the substantial influence of [the misconduct]'--a dismissal

is not warranted." Isgro, 974 F.2d at 1094.

> 3.    The Addition to the "United States Attorney and his Assistant United States Attorneys" Instruction Did Not Violate the Constitution

Concerning the new grand jurors' relationship to the United States Attorney and the Assistant

U.S. Attorneys, Judge Burns variously stated:

> [T]here's a close association between the grand jury and the U.S. Attorney's Office.
>
> .    .    .    .   You'll work closely with the U.S. Attorney's Office in your investigation of cases.

Partial Transcript p. 11.

> [I]n my experience here in the over 20 years in this court, that kind of tension does not exist on a regular basis, that I can recall, between the U.S. Attorney and the grand juries.  They generally work together.

Partial Transcript p. 12.

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury.  You're all about probable cause.  If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well.  As I told you, in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.

Partial Transcript p. 20.[8]

> As a practical matter, you will work closely with government lawyers.  The U.S. Attorney and the Assistant U.S. Attorneys will provide you with important services and help you find your way when you're confronted with complex legal matters.  It's entirely proper that you should receive the assistance from the government lawyers.
>
> But at the end of the day, the decision about whether a case goes forward and an indictment should be returned is yours and yours alone.  If past experience is any indication of what to expect in the future, then you can expect that the U.S. Attorneys that will appear in front of you will be candid, they'll be honest, that they'll act in good faith in all matters presented to you.

Partial Transcript pp. 26-27.

---

[8]    Just prior to this instruction, Judge Burns had informed the grand jurors that:

> [T]hese proceedings tend to be one-sided necessarily. . . . Because it's not a full-blown trial, you're likely in most cases not to hear the other side of the story, if there is another side to the story.

Partial transcript p. 19.

07CR3032-WQH

Commenting on the phrase, "the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence," Defendant proposes that by making that statement, "Judge Burns also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause." [Memorandum p. 8-9.] Defendant then ties this statement to the later instruction which "advis[ed] the grand jurors that they 'can expect that the U.S. Attorneys that will appear in front of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you.'" [Memorandum p. 9.] From this lash-up Defendant contends:

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

(1) I have to consider evidence that undercuts probable cause.

(2) The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.

(3) Because no such evidence was presented to me, I may conclude that there is none. Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions therefore discourage investigation--if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time and provide additional support to every probable cause determination: i.e., this case may be week [sic], but I know that there is nothing on the other side of the equation because it was not presented. A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

[Memorandum p. 9.]  (Emphasis added.)[2]/

Frankly, Judge Burns' statement that "the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence," is directly contradicted by United States v. Williams, 504 U.S. 36, 51-53 (1992) ("If the grand jury has no

---

[2]    The term "presumption" is too strong a word in this setting. The term "inference" is more appropriate. See McClean v. Moran, 963 F.2d 1306 (9th Cir. 1992) which states there are (1) permissive inferences; (2) mandatory rebuttable presumptions; and (3) mandatory conclusive presumptions, and explains the difference between the three. 963 F.2d at 1308-09 (discussing Francis v. Franklin, 471 U.S. 314 (1985); Sandstrom v. Montana, 442 U.S. 510 (1979); and Ulster County Court v. Allen, 442 U.S. 140, 157 & n. 16 (1979)). See also United States v. Warren, 25 F.3d 890, 897 (9th Cir. 1994).

obligation to consider all 'substantial exculpatory' evidence, we do not understand how the prosecutor can be said to have a binding obligation to present it."[10] (emphasis added)). See also, United States v. Haynes, 216 F.3d 789, 798 (9th Cir. 2000) ("Finally, their challenge to the government's failure to introduce evidence impugning Fairbanks's credibility lacks merit because prosecutors have no obligation to disclose 'substantial exculpatory evidence' to a grand jury." (citing Williams) (emphasis added)).

However, the analysis does not stop there. Prior to assuming his judicial duties, Judge Burns was a member of the United States Attorney's Office, and made appearances in front of the federal grand jury.[11] As such he was undoubtedly aware of the provisions in the United States Attorneys' Manual ("USAM").[12] Specifically, it appears he is aware of USAM Section 9-11.233 thereof which reads:

> In United States v. Williams, 112 S.Ct. 1735 (1992), the Supreme Court held that the Federal courts' supervisory powers over the grand jury did not include the power to make a rule allowing the dismissal of an otherwise valid indictment where the prosecutor failed to introduce substantial exculpatory evidence to a grand jury. It is the policy of the Department of Justice, however, that when a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence that directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such person. While a failure to follow the Department's policy should not

---

[10]    Note that in Williams the Court established:

> Respondent does not contend that the Fifth Amendment itself obliges the prosecutor to disclose substantial exculpatory evidence in his possession to the grand jury. Instead, building on our statement that the federal courts "may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress," he argues that imposition of the Tenth Circuit's disclosure rule is supported by the courts' "supervisory power."

504 U.S. at 45 (citation omitted). The Court concluded, "we conclude that courts have no authority to prescribe such a duty [to present exculpatory evidence] pursuant to their inherent supervisory authority over their own proceedings." 504 U.S. at 55. See also, United States v. Haynes, 216 F.3d 789, 797-98 (9th Cir. 2000). However, the Ninth Circuit in Isgro used Williams' holding that the supervisory powers would not be invoked to ward off an attack on grand jury procedures couched in constitutional terms. 974 F.2d at 1096.

[11]    He recalled those days when instructing the new grand jurors. [Partial Transcript pp. 12, 14-16, 17-18.]

[12]    The USAM is available on-line at www.usdoj.gov/usao/eousa/foia_reading_room/usam/index.html.

result in dismissal of an indictment, appellate courts may refer violations of the policy to the Office of Professional Responsibility for review.

(Emphasis added.)[13] This policy was reconfirmed in USAM 9-5.001, Policy Regarding Disclosure of Exculpatory and Impeachment Information, Paragraph "A," "this policy does not alter or supersede the policy that requires prosecutors to disclose 'substantial evidence that directly negates the guilt of a subject of the investigation' to the grand jury before seeking an indictment, see USAM § 9-11.233 ." (Emphasis added.)[14]

The facts that Judge Burns' statement contradicts Williams, but is in line with self-imposed guidelines for United States Attorneys, does not create the constitutional crisis proposed by Defendant. No improper presumption/inference was created when Judge Burns reiterated what he knew to be a self-imposed duty to the new grand jurors. Simply stated, in the vast majority of the cases the reason the prosecutor does not present "substantial" exculpatory evidence, is because no "substantial" exculpatory evidence exists.[15] If it does exist, as mandated by the USAM, the evidence should be presented to the grand jury by the Assistant U.S. Attorney upon pain of possibly having his or her career destroyed by an Office of Professional Responsibility investigation. Even if there

---

[13]     See www.usdoj.gov/usao/eousa/foia_reading_room/usam/ title9/11mcrm.htm. Even if Judge Burns did not know of this provision in the USAM while he was a member of the United States Attorney's Office, because of the accessability of the USAM on the internet, as the District Judge overseeing the grand jury he certainly could determine the required duties of the United States Attorneys appearing before the grand jury from that source.

[14]     See   www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/5mcrm.htm. Similarly, this new section does not bestow any procedural or substantive rights on defendants.

Under this policy, the government's disclosure will exceed its constitutional obligations. This expanded disclosure policy, however, does not create a general right of discovery in criminal cases. Nor does it provide defendants with any additional rights or remedies.

USAM 9-5.001, ¶ "E". See www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/ 5mcrm.htm.

[15]     Recall Judge Burns also told the grand jurors that:

[T]hese proceedings tend to be one-sided necessarily. . . . Because it's not a full-blown trial, you're likely in most cases not to hear the other side of the story, if there is another side to the story.

Partial transcript p. 19.

is some nefarious slant to the grand jury proceedings when the prosecutor does not present any "substantial" exculpatory evidence, because there is none, the negative inference created thereby in the minds of the grand jurors is legitimate. In cases such as Defendant's, the Government has no "substantial" exculpatory evidence generated from its investigation or from submissions tendered by the defendant.[16/] There is nothing wrong in this scenario with a grand juror inferring from this state-of-affairs that there is no "substantial" exculpatory evidence, or even if some exculpatory evidence were presented, the evidence presented represents the universe of all available exculpatory evidence.

Further, just as the instruction language regarding the United States Attorney attacked in Navarro-Vargas was found to be "unnecessary language [which] does not violate the Constitution," 408 F.3d at 1207, so too the "duty-bound" statement was unnecessary when charging the grand jury concerning its relationship with the United States Attorney and her Assistant U.S. Attorneys, and does not violate the Constitution. In United States v. Isgro, 974 F.2d 1091 (9th Cir. 1992), the Ninth Circuit while reviewing Williams established that there is nothing in the Constitution which requires a prosecutor to give the person under investigation the right to present anything to the grand jury (including his or her testimony or other exculpatory evidence), and the absence of that information does not require dismissal of the indictment. 974 F.2d at 1096 ("Williams clearly rejects the idea that there exists a right to such 'fair' or 'objective' grand jury deliberations."). That the USAM imposes a duty on United States Attorneys to present "substantial" exculpatory evidence to the grand jury is irrelevant since by its own terms the USAM excludes defendants from reaping any benefits from the self-imposed policy.[17/] Therefore, while the "duty-bound" statement was an interesting tidbit of information, it was unnecessary in terms of advising the grand jurors of their rights and

---

[16]    Realistically, given "that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge [i.e. only finding probable cause]," Williams, 504 U.S. at 51 (citing United States v. Calandra, 414 U.S. 338, 343-44 (1974)), no competent defense attorney is going to preview the defendant's defense story prior to trial assuming one will be presented to a fact-finder. Therefore, defense submissions to the grand jury will be few and far between.

[17]    The apparent irony is that although an Assistant U.S. Attorney will not lose a case for failure to present exculpatory information to a grand jury per Williams, he or she could lose his or her job with the United States Attorney's Office for such a failure per the USAM.

responsibilities, and does not cast an unconstitutional pall upon the instructions which requires dismissal of the indictment in this case or any case. The grand jurors were repeatedly instructed by Judge Burns that, in essence, the United Sates Attorneys are "good guys," which was authorized by Navarro-Vargas. 408 F.3d at 1206-07 ("laudatory comments . . . not vouching for the prosecutor"). But he also repeatedly "remind[ed] the grand jury that it stands between the government and the accused and is independent," which was also required by Navarro-Vargas. 408 F.3d at 1207. In this context the unnecessary "duty-bound" statement does not mean the instructions were constitutionally defective requiring dismissal of this indictment or any indictment.

The "duty bound" statement constitutional contentions raised by Defendant do not indicate that the "'structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice' to the defendant," and "[the] defendant can[not] show a history of prosecutorial misconduct that is so systematic and pervasive that it affects the fundamental fairness of the proceeding or if the independence of the grand jury is substantially infringed." Isgro, 974 F.2d at 1094 (citation omitted). Therefore, this Indictment, or any other indictment, need not be dismissed.

**B.      Count One Is Not Duplicitous**

Defendant alleges that Count One is duplicitous because the separate offenses of assaulting, esisting, opposing, impeding and interfering are alleged in one count. (Def.'s Mem. at 14.) Ninth Circuit precedents permit an indictment to allege in one count a crime in which Congress has provided for several ways in which it could be committed. See United States v. Urrutia, 897 F.2d 430, 432 (9th Cir. 1990). Moreover, the Eighth Circuit has considered and rejected this exact argument. See United States v. Street, 66 F.3d 969 (8th Cir. 1995).

**1.      It Is Permissible To Allege Assaulting, Resisting, Opposing, Impeding, and Interfering as Means Of Committing The Same Offense In The Indictment**

An indictment is duplicitous where a single count joins two or more distinct and separate offenses. See United States v. UCO Oil Co., 546 F.2d 833, 835 (9th Cir. 1976). "One vice of duplicity is that a jury may find a defendant guilty on a count without having reached a unanimous verdict on the commission of a particular offense." Id.; see also United States v. Ramirez-Martinez,

273 F.3d 903, 913 (9th Cir. 2001). Conversely, alleging a single offense in an several counts of an indictment offends the rule against multiplicity, exposing a defendant to punishment on multiple counts for a single offense. UCO Oil Co., 546 F.2d at 835. To determine whether a single count contains separate offenses, the Ninth Circuit has examined four factors: (1) "the language of the statute itself," (2) "the legislative history and statutory context," (3) "the nature of the proscribed conduct itself," and (4) "the appropriateness of multiple punishment for the conduct charged in the indictment." Id. at 835-38.

The Ninth Circuit permits an indictment to allege an offense conjunctively, where the statute is written in the disjunctive. In Urrutia, 897 F.2d at 431, the defendant was charged in an indictment with entering a bank with the intent to commit "any felony affecting such bank . . . or any larceny." On appeal, the defendant argued that the statute contained separate offenses, and the United States was obligated to prove both that the defendant intended to commit a larceny and that the defendant intended to commit a felony. Id. at 432. The Ninth Circuit disagreed, concluding that "[w]hen a statute specifies two or more ways in which an offense may be committed, all may be alleged in the conjunctive in one count and proof of any of those acts conjunctively charged may establish guilt." Id.; see also United States v. Arias, 253 F.3d 453, 457-58 (9th Cir. 2001) ("When, as here, the statute speaks disjunctively, the conjunctive is not required even if the offense is charged conjunctively in the indictment.").

The Eight Circuit has considered this argument. In Street, the defendant argued that six separate crimes were listed in § 111(a). Id. at 974. The Eight Circuit concluded otherwise:

> Section 111(a)(1) defines a single crime, not multiple offenses. The offense is intimidating or threatening by specified acts federal officials engaged in the performance of official duties. The statute lists all of the acts of violation in one sentence, and imposes a single penalty for all of them, "a construction which indicates that Congress did not mean to create more than one offense."

Id. (quoting United States v. Mal, 942 F.2d 682, 688 (9th Cir.1991)) (emphasis added). The Court explained, "Congress created the single crime of harming or threatening a federal official, and specified six ways in which the crime could be committed." Id. at 975.

Here, as discussed in Street, the language of the statute sets forward a single offense that may be committed in multiple ways. The Indictment tracks the language of the statute, alleging in the

conjunctive what Congress proscribed in the disjunctive.  It charges Defendant with the single offense of using force against Agent Allen in a single act, by dragging Agent Allen with his vehicle while fleeing the checkpoint.  The legislative history supports this reading.  See United States v. Feola, 420 U.S. 671, 678-84 (1975) (discussing history of the statute).  The nature of the offense is interference with the execution of duty by federal officers, not merely the application of force to a federal employee.  Id.  Finally, under Defendant's construction, if a jury convicted Defendant of forcibly assaulting Agent Allen in one count, and of forcibly resisting Agent Allen in a second count, and of forcibly interfering with Agent Allen in a third count, all for the single act of dragging Agent Allen from the checkpoint, multiple punishments for the single act could be imposed.

Defendant cites United States v. Johnson, 462 F.2d 423, 428 (3rd Cir. 1972) and United States v. Marcello, 423 F.2d 993, 1011 (5th Cir. 1970) to support his argument.  In Johnson, 462 F.2d 425, the defendant was charged in a three count indictment with the following:  (1) a willful assault of federal officers; (2) willfully resisting, opposing, impeding, and interfering with federal officers; and (3) endeavoring, by threats of force, to impede IRS officers in the exercise of their duties and in their official capacities.  After a jury trial, he was acquitted on count 1 and a conviction on the remaining counts.  Id. at 426.  On appeal, the defendant argued that since the counts alleged were multiplicitous statements of the same offense, the jury arrived at inconsistent verdicts.  Id.  The Third Circuit disagreed and stated that "the various words used to describe the type of behavior prohibited by Section 111 constitute separate and distinct offenses, so that [the defendant] was properly chargeable with both one count of assault under this section as well as the second count charging willful and forcible intimidation and resistance."  Id. at 428-29.  In other words, there were several ways to commit the same crime.  Importantly, the Third Circuit found no error where the defendant was charged with alternative means of committing the same offense in count 2, just as Defendant is charged here in Count One.

Similarly, the Marcello decision is of no assistance to Defendant.  In Marcello, 423 F.2d at 1000, the defendant challenged his indictment which alleged that he "did forcibly assault and intimidate Patrick J. Collins, Jr., an officer of the Federal Bureau of Investigation, while . . . Collins was engaged in the performance of his official duties in violation of Title 18, United States Code,

07CR3032-WQH

1   Section 111." Notice, he was charged in the conjunctive. The Fifth Circuit found no error. Id. After

2   being convicted, the defendant challenged the sufficiency of the evidence. The Fifth Circuit stated

3   that there was sufficient evidence that the defendant either forcibly assaulted, intimidated, or both:

> we hold that there is more than ample evidence from which the jury could find that
> Collins was either forcibly assaulted, intimidated, or both. n28 The punch in the face
> was a forcible assault (see contention No. 11, supra). And since this more than put
> Collins in fear of being struck, it constituted forcible intimidation as well.

7   Id. at 1012. Thus, while the United States has charged alternative means of proving the same

8   offense, this is not error.

9                    **2.     It Is Not Necessary To Allege Willfulness**

10   Defendant next contends that Count One fails to allege that he acted willfully. (Def.'s Mot.

11   5-6.) He cites a passage from United States v. Sommerstedt, 752 F.2d 1494 (9th Cir. 1985).

12   In Sommerstedt, the court stated that "[a]n assault 'is committed by either a willful attempt

13   to inflict injury upon the person of another, or by a threat to inflict injury upon the person of another

14   which, when coupled with an apparent present ability, causes a reasonable apprehension of

15   immediate bodily harm.'" 752 F.2d at 1496 (quoting United States v. Dupree, 544 F.2d 1050 (9th

16   Cir. 1976) (per curiam)). Turning to the Dupree decision, upon which Sommerstedt relies, sheds

17   light on that quotation.

18   In Dupree, the defendant was charged with assault with a dangerous weapon in violation of

19   18 U.S.C. § 113(c), and the district court dismissed the indictment as unconstitutionally vague. In

20   discussing the statute, and reversing the district court, the Ninth Circuit defined an assault by

21   reference to the common law definition. The federal definition of assault included both an attempt

22   to commit a battery and a tortious assault was an act that put another in reasonable apprehension of

23   bodily harm. Dupree, 544 F.2d at 1051. The appellate court made clear, however, that "an assault

24   is an attempted battery and proof of a battery will support conviction of assault." Id. at 1052

25   (emphasis added); see also United States v. Loera, 923 F.2d 725, 728 (9th Cir. 1991) (quoting the

26   definition of assault in Dupree).

27   A more recent decision addresses the argument presented by Defendant that willfulness must

28   be alleged and proven. In Loera, 923 F.2d at 726-27, in the context of § 113, the defendant was

convicted of an assault resulting in serious bodily injury based on evidence that he drank heavily, drove and crossed the centerline, killing one person and injuring another. On appeal, he argued that the assault conviction must be overturned because the United States failed to establish that his conduct was willful.  The Ninth Circuit concluded:

> The term "willful" as used at common law as an element of a general intent crime refers to a volitional act. See With. Clark, Clark's Criminal Law 38 (St. Paul 1894) ("A willful act . . . is a voluntary act."). A voluntary act is one in which the individual has the ability to choose his course of conduct. "The only question is whether the person could have refrained from doing it, or whether he was controlled by some irresistible power.  If he could have refrained, the act is voluntary; but, if he was impelled by some irresistible force, it is involuntary." Id.

Loera, 923 F.2d at 728.  In the context of § 111, the Ninth Circuit has stated, "no intent to injure is required for the offense of assaulting a federal officer."  United States v. Sanchez, 914 F.2d 1355, 1358 (9th Cir. 1990); see also United States v. Jim, 865 F.2d 911 (9th Cir. 1989) (holding general intent required for assault conviction).

C.    **Defendant's Motion to Suppress Evidence or Dismiss The Indictment Based on Fourth Amendment Grounds Should Be Denied**

Defendant claims, with no supporting affidavit or other evidence, that evidence should be suppressed based on his claim that Agent Booth used unreasonable force in apprehending him.  In general, a Fourth Amendment claim of excessive force is analyzed under the framework set forth in the Supreme Court's decision in Graham v. Connor, 490 U.S. 386 (1989).  For example, in Miller v. Clark County, 340 F.3d 959 (9th Cir. 2003), the Ninth Circuit explained:  "In determining the reasonableness of a seizure effected by non-deadly force, we balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against 'the countervailing government interests at stake.'"  Id. at 964 (applying Graham test).

Deadly force has been defined by the Ninth Circuit as force that "creates a substantial risk of causing death or serious bodily injury."  Smith v. City of Hemet, 394 F.3d 689, 706 (9th Cir. 2005).  Even deadly force is reasonable to prevent escape, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."  Tennessee v. Garner, 471 U.S. 1, 11 (1985).  Under the circumstances in this case, Agent Booth plainly acted  in defense of his own safety as he was placed by the Defendant under an immediate

1  threat of severe bodily injury from the rock aimed at Agent Booth's head by the Defendant.

2  Accordingly, Defendant's effort to suppress evidence must be rejected.

3  **D.    Defendant's Motion To Suppress Statements Should Be Denied**

4  Defendant moves to suppress statements and requests that the Government prove that all

5  statements were voluntarily made, and made after a knowing and intelligent <u>Miranda</u> waiver.

6  Defendant contends that 18 U.S.C. § 3501 mandates an evidentiary hearing be held to determine

7  whether Defendant's statements were voluntary.  Defendant's motion to suppress statements should

8  be denied without an evidentiary hearing because he failed to support his contentions with a sworn

9  declaration as required by Crim LR 47.1(g).

10  1.    <u>Knowing, Intelligent, and Voluntary Miranda Waiver</u>

11  A statement made in response to custodial interrogation is admissible under <u>Miranda v.</u>

12  <u>Arizona</u>, 384 U.S. 437 (1966), and 18 U.S.C. § 3501 if a preponderance of the evidence indicates

13  that the statement was made after an advisement of <u>Miranda</u> rights, and was not elicited by improper

14  coercion.  <u>See Colorado v. Connelly</u>, 479 U.S. 157, 167-70 (1986) (preponderance of evidence

15  standard governs voluntariness and <u>Miranda</u> determinations; valid waiver of <u>Miranda</u> rights should

16  not be found in the "absence of police overreaching").

17  A valid <u>Miranda</u> waiver depends on the totality of the circumstances, including  the

18  background, experience, and conduct of the  defendant.  <u>North Carolina v. Butler</u>, 441 U.S. 369,

19  374-75 (1979).   To be knowing and intelligent, "the waiver must have been made with a full

20  awareness of both the nature of the right being abandoned and the consequences of the decision to

21  abandon it." <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986). The Government bears the burden of

22  establishing the existence of  a valid <u>Miranda</u> waiver. <u>North Carolina v. Butler</u>, 441 U.S. at 373.  In

23  assessing the validity of a defendant's <u>Miranda</u> waiver, this Courts should analyze the totality of the

24  circumstances surrounding the interrogations.  <u>See Moran v. Burbine</u>, 475 U.S. at 421.   Factors

25  commonly considered include: (1) the defendant's age (<u>see</u> <u>United States v. Doe</u>, 155 F.3d 1070,

26  1074-75 (9th Cir. 1998) (<u>en</u> <u>banc</u>) (valid waiver because the 17 year old defendant did not have

27  trouble understanding questions, gave coherent answers, and did not ask officers to notify parents),

28  (2) the defendant's familiarity with the criminal justice system (<u>see</u> <u>United States v. Williams</u>, 291

F.3d 1180, 1190 (9th Cir. 2002) (waiver valid in part because defendant was familiar with the criminal justice system from past encounters), (3) the explicitness of the Miranda waiver (see United States v. Bernard S., 795 F.2d 749, 753 n.4 (9th Cir. 1986) (a written Miranda waiver is "strong evidence that the waiver is valid"); United States v. Amano, 229 F.3d 801, 805 (9th Cir. 2000) (waiver valid where Miranda rights were read to defendant twice and defendant signed a written waiver), and (4) the time lapse between the reading of the Miranda warnings and the interrogation or confession. See Guam v. Dela Pena, 72 F.3d 767, 769-70 (9th Cir. 1995) (valid waiver despite 15-hour delay between Miranda warnings and interview).

Here, the Border Patrol agents advised Defendant of his Miranda rights prior to any post-arrest custodial interrogation. As evidenced by the digital video recording, Defendant was advised of his Miranda rights before the interrogation. Defendant orally agreed to waive his Miranda rights. Based on the totality of the circumstances, Defendant's statements should not be suppressed because his Miranda waiver was knowing, intelligent, and voluntary.

### 2.    Defendant's Statements Were Voluntary

The inquiry into the voluntariness of statements is the same as the inquiry into the voluntariness of a waiver of Miranda rights. See Derrick v. Peterson, 924 F.2d 813, 820 (9th Cir.1990). Courts look to the totality of the circumstances to determine whether the statements were "the product of free and deliberate choice rather than coercion or improper inducement." United States v. Doe, 155 F.3d 1070, 1074(9th Cir. 1998)(en banc).

A confession is involuntary if "coerced either by physical intimidation or psychological pressure." United States v. Crawford, 372 F.3d 1048, 1060 (9th Cir. 2004) (quoting United States v. Haswood, 350 F.3d 1024, 1027 (9th Cir. 2003)). In determining whether a defendant's confession was voluntary, "the question is 'whether the defendant's will was overborne at the time he confessed.'" Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir.), cert. denied, _ U.S. _, 124 S. Ct. 446 (2003) (quoting Haynes v. Washington, 373 U.S. 503, 513 (1963)). Psychological coercion invokes no per se rule. United States v. Miller, 984 F.2d 1028, 1030 (9th Cir. 1993). Therefore, the Court must "consider the totality of the circumstances involved and their effect upon the will of the defendant." Id. at 1031 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226-27 (1973)).

1    In determining the issue of voluntariness, this Court should consider the five factors under

2    18 U.S.C. § 3501(b).  United States v. Andaverde, 64 F.3d 1305, 1311 (9th Cir. 1995).  These five

3    factors include: (1) the time elapsing between arrest and arraignment of the defendant making the

4    confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the

5    nature of the offense with which he or she was charged or of which he was suspected at the time of

6    making the confession, (3) whether or not such defendant was advised or knew that he or she was

7    not required to make any statement and that any such statement could be used against him, (4)

8    whether or not such defendant had been advised prior to questioning of his or her right to the

9    assistance of counsel; and (5)  whether or not such defendant was without the assistance of counsel

10   when questioned and when giving such confession.  18 U.S.C. § 3501(b).  All five statutory factors

11   under 18 U.S.C. § 3501(b) need not be met to find the statements were voluntarily made.  See

12   Andaverde, 64 F.3d at 1313.

13   As discussed above, Defendant was read his Miranda rights and explicitly stated that he

14   understood his Miranda rights and agreed to waive those rights.  See United States v. Gamez, 301

15   F.3d 1138, 1144 (9th Cir. 2002).  Defendant's statements were not the product of physical

16   intimidation or psychological pressure of any kind by any Government agent.  There is no evidence

17   that Defendant's will was overborne at the time of his statements.  Consequently, Defendant's

18   motion to suppress his statements as involuntarily given should be denied.

19   3.    Defendant's Motion Should Be Denied Without An Evidentiary Hearing

20   This Court can and should deny (without prejudice) Defendant's motion to suppress

21   statements without an evidentiary hearing.  First, under Ninth Circuit precedent as well as Southern

22   District Local Criminal Rule 47.1(g)(1)-(4), a defendant is entitled to an evidentiary hearing on a

23   motion to suppress only when the defendant adduces specific facts sufficient to require the granting

24   of the defendant's motion.  United States v. Batiste, 868 F.2d 1089, 1093 (9th Cir. 1989) ("[T]he

25   defendant, in his motion to suppress, failed to dispute any material fact in the government's proffer.

26   In these circumstances, the district court was not required to hold an evidentiary hearing.").

27   Second, an evidentiary hearing is not required if a defendant's motion to suppress and

28   supporting declarations or affidavits fail to allege a specific factual dispute.  See United States v.

1    Walczak, 783 F.2d 852, 857 (9th Cir. 1986) (an evidentiary hearing is required "if the moving

2    papers are definite, specific, detailed and nonconjectural to enable the court to conclude that

3    contested issues of [material] fact . . . are at issue"); see United States v. Howell, 231 F.3d 616, 620-

4    23 (9th Cir. 2000) (holding that "[a]n evidentiary hearing on a motion to suppress need be held only

5    when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable

6    the trial court to conclude that contested issues of fact exist."); United States v. Batiste, 868 F.2d

7    1089, 1093 (9th Cir. 1989) (District Court is not required to hold an evidentiary hearing where

8    "defendant, in his motion to suppress, failed to dispute any material fact in the government's

9    proffer"); United States v. Moran-Garcia, 783 F. Supp. 1266, 1274 (S.D. Cal. 1991) (motion to

10   suppress "akin to boilerplate motions that lay no factual foundation" and unsworn representations

11   of counsel were "too indefinite and conjectural to require the government to respond").

12        Defendant  failed to specifically identify the statements that he seeks to suppress or allege

13   any specific factual or legal dispute regarding the admissibility of the statements.  Defendant did

14   not allege that the Border Patrol agents failed to advise Defendant of his Miranda rights, that the

15   Miranda rights provided were somehow defective, that his Miranda waivers were not knowingly,

16   intelligently, or voluntarily made, or that the statements were involuntarily coerced.

17        **E.    Defendant's Motion to Dismiss Count 2 Should Be Denied.**

18        As Defendant acknowledges in his papers (Mem. At 18), his motion is contrary to binding

19   Ninth Circuit  authority.   See  United States v. Rivera-Sillas, 376 F.2d 887 (9th Cir. 2004).

20   Accordingly, this motion must be denied.

21        **F.    The Government Will Comply With All Discovery Obligations**

22        The Government intends to continue full compliance with its discovery obligations under

23   Brady v. Maryland, 373 U.S. 83 (1963), the Jencks Act (18 U.S.C. 3500), and Rule 16 of the Federal

24   Rules of Criminal Procedure.[18]  To date, the Government has provided 143  pages of discovery as

25   9 CD/DVDs that include the advisal of rights and post-Miranda statement of Defendant; statements

26   of the material witnesses; photographs and other materials.  The Government anticipates that all

27

28        [18]    Unless otherwise noted, all references to "Rules" refers to the Federal Rules of
              Criminal Procedure.

1    discovery issues can be resolved amicably and informally, and has addressed Defendant's specific

2    requests below.

3         **(1)    Brady Material**

4         The Government has and will continue to perform its duty under <u>Brady</u> to disclose material

5    exculpatory information or evidence favorable to Defendant  when such evidence is material to guilt

6    or punishment.  The Government recognizes that its obligation under <u>Brady</u> covers not only

7    exculpatory evidence, but also evidence that could be used to impeach witnesses who testify on

8    behalf of the United States.  <u>See</u> <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972); <u>United States</u>

9    <u>v. Bagley</u>, 473 U.S. 667, 676-77 (1985).  This obligation also extends to evidence that was not

10   requested by the defense.  <u>Bagley</u>, 473 U.S.  at 682; <u>United States v. Agurs</u>, 427 U.S. 97, 107-10

11   (1976).  "Evidence is material, and must be disclosed (pursuant to <u>Brady</u>), 'if there is a reasonable

12   probability that, had the evidence been disclosed to the defense, the result of the proceeding would

13   have been different.'"  <u>Carriger v. Stewart</u>, 132 F.3d 463, 479 (9th Cir. 1997) (<u>en</u> <u>banc</u>).  The final

14   determination of materiality is based on the "suppressed evidence considered collectively, not item

15   by item."  <u>Kyles v. Whitley</u>, 514 U.S. 419, 436-37 (1995).

16        <u>Brady</u> does not, however, mandate that the Government open all of its files for discovery.

17   <u>See</u> <u>United States v. Henke</u>, 222 F.3d 633, 642-44 (9th Cir. 2000)(<u>per</u> <u>curiam</u>).  Under <u>Brady</u>, the

18   Government is not required to provide: (1) neutral, irrelevant, speculative, or inculpatory evidence

19   (<u>see</u> <u>United States v. Smith</u>, 282 F.3d 758, 770 (9th Cir. 2002)); (2) evidence available to the

20   defendant from other sources (<u>see</u> <u>United States v. Bracy</u>, 67 F.3d 1421, 1428-29 (9th Cir. 1995));

21   (3) evidence that the defendant already possesses (<u>see</u> <u>United States v. Mikaelian</u>, 168 F.3d 380,

22   389-90 (9th Cir. 1999), <u>amended by</u> 180 F.3d 1091 (9th Cir. 1999)); or (4) evidence that the

23   undersigned Assistant U.S. Attorney could not reasonably be imputed to have knowledge or control

24   over.  (<u>see</u> <u>United States v. Hanson</u>, 262 F.3d 1217, 1234-35 (11th Cir. 2001)).  Nor does <u>Brady</u>

25   require the Government "to create exculpatory evidence that does not exist," <u>United States v.</u>

26   <u>Sukumolahan</u>, 610 F.2d 685, 687 (9th Cir. 1980), but only requires that the Government "supply a

27   defendant with exculpatory information of which it is aware." <u>United States v. Flores</u>, 540 F.2d 432,

28   438 (9th Cir. 1976).

### (2)    Proposed 404(b) and 609 Evidence

Should the United States seek to introduce any similar act evidence pursuant to Federal Rules of Evidence 404(b) or 609(b), the United States will provide Defendant with notice of its proposed use of such evidence and information about such bad act at or before the time the United States' trial memorandum is filed. The United States reserves the right to introduce as prior act evidence any conviction, arrest or prior act that is disclosed to the defense in discovery.

### (3)    Request for Preservation of Evidence

After issuance of a an order from the Court, the United States will preserve all evidence to which Defendant is entitled to pursuant to the relevant discovery rules. However, the United States objects to Defendant's blanket request to preserve all physical evidence.

The United States has complied and will continue to comply with Rule 16(a)(1)(C) in allowing Defendant an opportunity, upon reasonable notice, to examine, copy and inspect physical evidence which is within his possession, custody or control of the United States, and which is material to the preparation of Defendant's defense or are intended for use by the United States as evidence in chief at trial, or were obtained from or belong to Defendant, including photographs. The United States has made the evidence available to Defendant and Defendant's investigators and will comply with any request for inspection.

### (4)  Defendant's Statements

The Government recognizes its obligation under Rules 16(a)(1)(A) and 16(a)(1)(B) to provide to Defendant the substance of Defendant's oral statements and Defendant's written statements. The Government has produced all of the Defendant's statements that are known to the undersigned Assistant U.S. Attorney at this date. If the Government discovers additional oral or written statements that require disclosure under Rule 16(a)(1)(A) or Rule 16(a)(1)(B), such statements will be provided to Defendant.

The Government has no objection to the preservation of the handwritten notes taken by any of the agents and officers. See United States v. Harris, 543 F.2d 1247, 1253 (9th Cir. 1976) (agents must preserve their original notes of interviews of an accused or prospective government witnesses). However, the Government objects to providing Defendant with a copy of the rough notes at this

1   time.  Rule 16(a)(1)(A) does not require disclosure of the rough notes where the content of those

2   notes have been accurately reflected in a type-written report.  See United States v. Brown, 303 F.3d

3   582, 590 (5th Cir. 2002); United States v. Coe, 220 F.3d 573, 583 (7th Cir. 2000) (Rule 16(a)(1)(A)

4   does not require disclosure of an agent's notes even where there are "minor discrepancies" between

5   the notes and a report).  The Government is not required to produce rough notes pursuant to the

6   Jencks Act, because the notes do not constitute "statements" (as defined 18 U.S.C. § 3500(e)) unless

7   the notes (1) comprise both a substantially verbatim narrative of a witness' assertion, and (2) have

8   been approved or adopted by the witness.  United States v. Spencer, 618 F.2d 605, 606-07 (9th Cir.

9   1980).  The rough notes in this case do not constitute "statements" in accordance with the Jencks

10  Act.  See United States v. Ramirez, 954 F.2d 1035, 1038-39 (5th Cir. 1992) (rough notes were not

11  statements under the Jencks Act where notes were scattered and all the information contained in the

12  notes was available in other forms).  The notes are not Brady material because the notes do not

13  present any material exculpatory information, or any evidence favorable to Defendant that is

14  material to guilt or punishment.  Brown, 303 F.3d at 595-96 (rough notes were not Brady material

15  because the notes were neither favorable to the defense nor material to defendant's guilt or

16  punishment); United States v. Ramos, 27 F.3d 65, 71 (3d Cir. 1994) (mere speculation that agents'

17  rough notes contained Brady evidence was insufficient).  If, during a future evidentiary hearing,

18  certain rough notes become discoverable under Rule 16, the Jencks Act, or Brady, the notes in

19  question will be provided to Defendant.

20              **(5)     Tangible Objects**

21          The Government has complied and will continue to comply with Rule 16(a)(1)(E) in

22  allowing Defendant an opportunity, upon reasonable notice, to examine, inspect, and copy all

23  tangible objects seized that are within its possession, custody, or control, and that are either material

24  to the preparation of Defendant's defense, or are intended for use by the Government as evidence

25  during its case-in-chief at trial, or were obtained from or belong to Defendant.   The Government

26  need not, however, produce rebuttal evidence in advance of trial.  United States v. Givens, 767 F.2d

27  574, 584 (9th Cir. 1984).

28

(6)    **Expert Witnesses**

The Government will comply with Rule 16(a)(1)(G) and provide Defendant with a written summary of any expert testimony that the Government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial.  This summary shall include the expert witnesses' qualifications, the expert witnesses opinions, the bases, and reasons for those opinions.

(7)    **Witness Addresses**

The Government has already provided Defendant with the reports containing the names of the agents involved in the apprehension and interviews of Defendant.  A defendant in a non-capital case, however, has no right to discover the identity of prospective Government witnesses prior to trial.  See Weatherford v. Bursey, 429 U.S. 545, 559 (1977); United States v. Dishner, 974 F.2d 1502, 1522 (9th Cir 1992) (citing United States v. Steel, 759 F.2d 706, 709 (9th Cir. 1985)); United States v. Hicks, 103 F.23d 837, 841 (9th Cir. 1996).   Nevertheless, in its trial memorandum, the Government will provide Defendant with a list of all witnesses whom it intends to call in its case-in-chief, although delivery of such a witness list is not required.  See United States v. Discher, 960 F.2d 870 (9th Cir. 1992); United States v. Mills, 810 F.2d 907, 910 (9th Cir. 1987).

The Government objects to any request that the Government provide a list of every witness to the crimes charged who will not be called as a Government witness.  "There is no statutory basis for granting such broad requests," and a request for the names and addresses of witnesses who will not be called at trial "far exceed[s] the parameters of Rule 16(a)(1)(C)."  United States v. Hsin-Yung, 97 F. Supp.2d 24, 36 (D. D.C. 2000) (quoting United States v. Boffa, 513 F. Supp. 444, 502 (D. Del. 1980)).  The Government is not required to produce all possible information and evidence regarding any speculative defense claimed by Defendant.  Wood v. Bartholomew, 516 U.S. 1, 6-8 (1995) (per curiam) (holding that inadmissible materials that are not likely to lead to the discovery of admissible exculpatory evidence are not subject to disclosure under Brady).

(8)    **Jencks Act Material**

The Jencks Act, 18 U.S.C. § 3500, requires that, after a Government witness has testified on direct examination, the Government must give the Defendant any "statement" (as defined by the

Jencks Act) in the Government's possession that was made by the witness relating to the subject matter to which the witness testified. 18 U.S.C. § 3500(b). A "statement" under the Jencks Act is (1) a written statement made by the witness and signed or otherwise adopted or approved by him, (2) a substantially verbatim, contemporaneously recorded transcription of the witness's oral statement, or (3) a statement by the witness before a grand jury. 18 U.S.C. § 3500(e). If notes are read back to a witness to see whether or not the government agent correctly understood what the witness was saying, that act constitutes "adoption by the witness" for purposes of the Jencks Act. United States v. Boshell, 952 F.2d 1101, 1105 (9th Cir. 1991) (citing Goldberg v. United States, 425 U.S. 94, 98 (1976)). While the Government is only required to produce all Jencks Act material after the witness testifies, the Government plans to provide most (if not all) Jencks Act material well in advance of trial to avoid any needless delays.

### (9)    Informants and Cooperating Witnesses

If the Government determines that there is a confidential informant who has information that is "relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause," the Government will either disclose the identity of the informant or submit the informant's identity to the Court for an in-chambers inspection. See Roviaro v. United States, 353 U.S. 53, 60-61 (1957) (emphasis added); United States v. Ramirez-Rangel, 103 F.3d 1501, 1505 (9th Cir. 1997) (same).

### (10)    Specific Request - Material Witness A-Files

The United States objects to Defendant's request to view the A-Files of the material witnesses in this case. The United States will, of course, comply with its Brady and Giglio obligations.

### (11)    Specific Request - Defendant's A-File

The A-File of the Defendant is available for review by Defense counsel.

### (12)    Specific Request - Medical Records/Reports

The United States has produced medical records and reports and will continue to comply with its discovery obligations.

07CR3032-WQH

**(13)    Specific Request - Dispatch Tapes**

The United States has produced dispatch tapes and will continue to comply with its discovery obligations.

**(14)    Residual Request**

The Government will comply with all of its discovery obligations, but objects to the broad and unspecified nature of Defendant's residual discovery request.

**G.    The Government Does Not Oppose Leave To File Further Motions, So Long As They Are Based on New Evidence**

The Government does not object to the granting of leave to file further motions as long as the order applies equally to both parties and any additional defense motions are based on newly discovered evidence or discovery provided by the Government subsequent to the instant motion.

### III

### GOVERNMENT MOTIONS

A.                Government Motion For Fingerprint Exemplars

Tthe Government requests that Defendant be ordered to make himself available for fingerprint exemplars at a time and place convenient to the Government's fingerprint expert. See United States v. Kloepper, 725 F. Supp. 638, 640 (D. Mass. 1989) (the District Court has "inherent authority" to order a defendant to provide handwriting exemplars, fingerprints, and palmprints).

Because the fingerprint exemplars are sought for the sole purpose of proving Defendant's identity, rather for than investigatory purposes, the Fourth Amendment is not implicated. See United States v. Garcia-Beltran, 389 F.3d 864, 866-68 (9th Cir. 2004) (citing United States v. Parga-Rosas, 238 F.3d 1209, 1215 (9th Cir. 2001)).    Furthermore, an order requiring Defendant to provide fingerprint exemplars does not infringe on Defendant's Fifth Amendment rights. See Schmerber v. California, 384 U.S. 757, 770-71 (1966) (the Fifth Amendment privilege "offers no protection against compulsion to submit to fingerprinting"); Williams v. Schario, 93 F.3d 527, 529  (8th Cir. 1996) (the taking of fingerprints in the absence of Miranda warnings did not constitute testimonial incrimination as proscribed by the Fifth Amendment).

B.    Government's Motion to Compel Reciprocal Discovery

1. All Evidence That Defendant Intends to Introduce in His Case-In-Chief

Since the Government will honor Defendant's request for disclosure under Rule 16(a)(1)(E), the Government is entitled to reciprocal discovery under Rule 16(b)(1).  Pursuant to Rule 16(b)(1), requests that Defendant permit the Government to inspect, copy and photograph any and all books, papers, documents, photographs, tangible objects, or make copies or portions thereof, which are within the possession, custody, or control of Defendant and which Defendant intends to introduce as evidence in his case-in-chief at trial.

The Government further requests that it be permitted to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case, which are in the possession and control of Defendant, which he intends to introduce as evidence-in-chief at the trial, or which were prepared by a witness whom Defendant intends to call as a witness.  The Government also requests that the Court make such order as it deems necessary under Rules 16(d)(1) and (2) to ensure that the Government receives the reciprocal discovery to which it is entitled.

2.    Reciprocal Jencks – Statements By Defense Witnesses

Rule 26.2 provides for the reciprocal production of Jencks material. Rule 26.2 requires production of the prior statements of all witnesses, except a statement made by Defendant.  The time frame established by Rule 26.2 requires the statements to be provided to the Government after the witness has testified.  However, to expedite trial proceedings, the Government hereby requests that Defendant be ordered to provide all prior statements of defense witnesses by a reasonable date before trial to be set by the Court.  Such an order should include any form in which these statements are memorialized, including but not limited to, tape recordings, handwritten or typed notes and reports.

33                                          07CR3032-WQH

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV**

**CONCLUSION**

For the foregoing reasons, the United States requests that the Court deny Defendant's motions and grant the United States' motions for reciprocal discovery and fingerprint exemplars.

Dated: December 13, 2007

Respectfully submitted,

KAREN P. HEWITT
United States Attorney

*s/Lawrence A. Casper*
LAWRENCE A. CASPER
Assistant U.S. Attorney

07CR3032-WQH

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Case No. 07CR3032-WQH |
| Plaintiff, | ) | |
| v. | ) | CERTIFICATE OF SERVICE |
| ISRAEL AMEZQUITA-LUNA, | ) | |
| Defendant. | ) | |

IT IS HEREBY CERTIFIED THAT:

I, Lawrence A. Casper, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of

UNITED STATES' RESPONSE AND OPPOSITION TO DEFENDANT'S MOTIONS TO: (1) DISMISS INDICTMENT DUE TO IMPROPER GRAND JURY INSTRUCTION; (2) DISMISS COUNT 1; 3) SUPPRESS EVIDENCE; 4) SUPPRESS STATEMENTS; (5) DISMISS COUNT 2; (6) COMPEL DISCOVERY; AND (7) GRANT LEAVE TO FILE FURTHER MOTIONS

TOGETHER WITH STATEMENT OF FACTS, MEMORANDUM OF POINTS AND AUTHORITIES, AND GOVERNMENT'S MOTIONS TO: (1) COMPEL FINGERPRINT EXEMPLARS; AND (2) COMPEL PRODUCTION OF RECIPROCAL DISCOVERY.

on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

**1.    Zandra Lopez, Esq.**

I hereby certify that I have caused to be mailed the foregoing, by the United States Postal Service, to the following non-ECF participants on this case:

**1.    None**

the last known address, at which place there is delivery service of mail from the United States Postal Service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 13, 2007.

*s/ Lawrence A. Casper*
LAWRENCE A. CASPER